## W. J. OLEWINE ET AL. v. G. R. MESSMORE ET AL.

ERROR TO THE COURT OF COMMON PLEAS OF FAYETTE COUNTY.

Argued May 13, 1889—Decided October 7, 1889.
[To be reported.]

1. In an action to try the title to land, an ancient deed from one in whom no title is shown, conveying the land to a person under whom the plaintiff claims, is admissible to exhibit color of title and claim in the grantee, when followed by proof that he actually settled on the land and continuously occupied it for the statutory period.
2. While a patentee is regarded as a trustee for the rightful owner, a patent containing a recital that the rights of the warrantee have become vested in the patentee, is prima facie evidence of title in the latter, and especially against one who relies on possession alone, who shows no title, or whose rights, if any, accrued after the date of the patent.
3. When one takes actual possession, by residence or cultivation, of a part of the land of another, under a bona fide claim, accompanied by a designation of boundaries and the ordinary use of woodland, lying within the designated bounds, and continues such use and possession for twenty-one years, he gains a title to all included within his lines.
4. But, if the grantee in a deed whose description embraces a strip of uninclosed woodland to which his vendor had no title, occupy, by residence and cultivation, only that part of the land conveyed to which his vendor did have title, his cutting firewood, making rails, and even making a clearing, upon the other part, not followed up by residence, inclosure or cultivation, give him no adverse possession thereof.
5. Adverse possession of land may be said to be founded in trespass, but it must be a trespass constantly continued by acts on the premises: it must challenge the right to all the world; the claimant must "keep his flag flying, and present a hostile front to all adverse pretensions."

Before PAXSON, C. J., STERRETT, GREEN, CLARK and Mc-COLLUM, JJ.

No. 261 January Term 1888, Sup. Ct.; court below, No. 316 March Term 1884, C. P.

On February 27, 1884, George R. Messmore and Albert G. Messmore, executors of the will of John Messmore, deceased, brought trespass quare clausum fregit against William J. Olewine and others, to recover damages for an entry by the defend-

ants upon a certain tract of land containing fifteen acres, alleged to be the property of the plaintiffs, and for the cutting of timber and erecting of certain buildings and structures thereon. The plea upon which the defendants went to trial was liberum tenementum.

At the trial on November 28, 1887, the following facts were shown:

Early in the year 1884, and prior to the commencement of this suit, the defendant William Olewine, together with the other defendants, who were his employees, entered upon the tract of land in question and erected thereon a small frame dwelling, a stable, and other out-buildings, using in the construction thereof timber which they cut on the premises. They also inclosed the land with a wire fence. Olewine then put a tenant in the dwelling so erected. At the time of their entry upon it, this tract was uninclosed woodland, and it had never been inclosed at any time.

For the purpose of showing title in themselves, the plaintiffs, after putting in evidence a survey made December 2, 1815, under a warrant granted September 30, 1815, to John Lynch, offered to read the record of a deed dated June 7, 1824, from Joseph Huston to John Huston, for the land covered by that survey. Admitted without objection. Upon its being read, the deed offered appeared to be a deed poll made by sheriff Craft, conveying the land in pursuance of a sheriff's sale of the same as the property of Joseph Huston. The defendants thereupon objected to its admission for this reason.

By the court: Objection overruled; exception.[1]

The plaintiffs put in evidence a certified copy of a record in the surveyor general's office showing a corrected plot of the land warranted to John Lynch. To the corrected plot was appended the following return:

" This tract is situate on the waters of Big Meadow Run and Gundy Creek, in Wharton township, Fayette county, and was surveyed by the direction of Alexander McClean (then D. S.) on the 2d day of December, 1815, in pursuance of a Warrant for 200 acres of land, dated the 30th of September, 1815; but owing to some oversight or mistake, the survey was made to embrace a part of a survey made in 1794 in the name of Joseph Gratz on a Warrant and so as to include 213½ acres.

I have now corrected it by throwing out the interference of said Gratz, and return the only part which should be held by the Jno. Lynch Warrant for Andrew Stewart, Esq., who claims the land. The lines marked A, B and C show the interference with Gratz.

"To JACOB SPANGLER, ESQ.,      F. LEWIS, D. S.
        Surveyor General.        6th June, 1830. "

The plaintiffs offered in evidence also a deed from John Huston to Andrew Stewart, dated December 1, 1832, conveying the land held under the John Lynch warrant.

Objected to on the ground that the deed is not competent evidence at the present time.

By the court: Objection overruled; exception.[2]

A patent for the same land, granted by the commonwealth to Andrew Stewart April 3, 1833, was then put in evidence by the plaintiffs. This patent recited that it was given in consideration of "moneys paid by John Lynch at the granting of the warrant hereinafter mentioned," and that the land described in it "was surveyed in pursuance of a warrant dated the 30th day of September, 1815, granted to the said John Lynch, whose right in and to the same by virtue of a sheriff's deed became vested in John Huston, who by deed dated the 1st December, 1832, conveyed his right in and to said tract to the said Andrew Stewart."

The plaintiffs then, by a regular chain of assurances, showed that the title of Andrew Stewart to the Lynch tract had become vested in themselves. They also adduced evidence tending to show that the land in dispute was embraced within the corrected survey under the John Lynch warrant; that in 1821 Andrew Stewart built upon the Lynch tract a stone house which was subsequently occupied by his tenants and used as a tavern; that both timber and stone used in its construction were obtained from the land in dispute; that this tavern was in the occupancy of Stewart's tenants, and of his successors in the title, from 1821 down until the entry of the defendants upon the land in controversy in 1884; that Stewart's tenants made the same use of the fifteen acres that they did of other similar portions of the Lynch tract, using and treating it as embraced in their leasehold.

The defendants, to show title in William Olewine, put in

evidence the record of a suit in partition between the heirs of Jonathan Downer, deceased, who as early as 1820 settled upon the Joseph Gratz tract, mentioned in the corrected return of the Lynch survey, and remained in the occupancy of said Gratz tract until his death, some time in or prior to 1846. This partition suit was brought to September Term, 1846, of the Court of Common Pleas. After due proceedings therein, the court made a decree for the sale of purpart B of the land, which purpart contained 87 acres and allowance. The defendants then put in evidence the deed poll of William Snyder, sheriff, to Samuel Shipley, dated March 14, 1848, conveying said purpart B under and in pursuance of the decree of sale made in said partition, and a chain of subsequent conveyances by which the Downer title to purpart B, with the exception of three acres thereof, was put in William Olewine. No conveyances anterior to the Downer partition proceedings were offered in evidence by the defendants, their chain of title, as exhibited by the papers put in evidence by them, commencing with that partition.

The defendants also introduced testimony tending to show that the lines of purpart B, as surveyed in the Downer partition, included the fifteen acres in dispute, as well as seventy-two acres of the Joseph Gratz tract, and that said fifteen acres were included in that part of purpart B which had subsequently been conveyed to Olewine; that on purpart B was a tavern, known as the Downer tavern, which had been built by Jonathan Downer, deceased, about 1820; that Samuel Shipley, the purchaser under the partition, and his successors in the title, were in possession of this tavern stand from 1848, when Shipley received his deed for purpart B from the sheriff, down until the time of the alleged trespass committed by the defendants, and claimed the fifteen acres of uninclosed woodland, in dispute in this case, as a part of their property, and under this claim exercised from time to time acts of ownership over it, such as cutting timber for saw-logs, posts, rails, etc., watering horses at a spring located on it, and generally making such use of it as they had occasion to make of land of that character. Samuel Shipley testified that during his ownership of the Downer tract, between 1848 and 1860, he had cleared about two acres of land above the head of Cool Spring, "perhaps fifty, twenty

or thirty or fifty yards up from the spring; something like one hundred and fifty feet; I think it is still cleared; has been cleared ever since." Cool Spring was a spring well known by that name, near which the disputed line ran.

Witnesses for the plaintiffs testified that there were no signs of a clearing ever having been made on the fifteen acres in dispute.

James Smith, sworn for the defendants, testified that in 1859 he was cutting rails on the disputed land, and while he was so engaged Andrew Stewart, in whom the title under which the plaintiff claimed then was, came along and had some conversation with the witness, but made no complaint that this cutting was a trespass on his land. Portions of the evidence for the defendants are more fully stated in the opinion of the Supreme Court, infra.

At the conclusion of the testimony the court, EWING, J., charged the jury in part as follows :

In this action the plaintiffs seek to recover from the defendants damages for a trespass committed on some real estate situate in Wharton township, in this county, the title to which, and the right of possession of which, is claimed by the plaintiffs. As the case stood when it was called for trial here, the plea of " not guilty " alone having been entered by the defendants, the burden rested upon the plaintiffs to prove the possession and the trespass ; but at that time the defendants amended by withdrawing their plea [of not guilty, and entering the plea] of " liberum tenementum. " Upon that plea the case has gone to trial and has been tried upon its merits regardless of the formality of the proceedings. The court has not seen the declaration and does not know but that the plea may have demanded a novel assignment, and there has been, so far as the court knows, no traverse of that plea ; but as I say, the case has gone to trial upon its merits, and by the entry of that plea the burden of this case has been thrown upon the defendants. By that plea, the defendants admit the possession in the plaintiffs and admit the trespass, but seek to justify their action on the ground that the title to the land belongs to them, and that they did only what an owner has a right to do to his own property.

The burden thus having been thrown upon the defendants,

it is their duty in this case to satisfy you that the property in dispute, the property whereon the trespass was committed, belonged to the defendants, and that they have a title to that property superior to that of the plaintiffs.

—The court after reviewing the testimony introduced by the defendants proceeded:

From this testimony the defendants claim that they have established title to the land in dispute. They have introduced no direct testimony to show that the title of the plaintiffs, to which I will call your attention presently, does not cover the same ground. They claim that their title does cover it, and that by virtue of holding the possession of the inclosed part of the same tract, that draws to it the possession of the uninclosed; and that they have shown possession from the Downers down to the present of the inclosed, and that drawing to it the possession of the uninclosed, their title is complete.

—The court then reviewed the testimony introduced by the plaintiffs, and proceeded:

Now from all this testimony the plaintiffs claim that it is their plot that covers this disputed land; that it is their possession in which this land has been all this time and not the defendants. It is your duty to ascertain, then, whether or not the title to this property in dispute where the trespass was committed is in the defendants or not; because it is the duty of the defendants to satisfy you of that. The burden of proof is on them, and it is their duty to make out a title here superior to that of the plaintiffs. They have admitted, as I said in my opening, possession in the plaintiffs, but if in going over this evidence, taking the papers and the parol testimony offered, together, you should find that the Stewart patent does not cover this place in dispute where the trespass was committed, and that the Shipley and Olewine papers do, you would be justified in finding a verdict in favor of the defendants. They would have the title to the property.

[They claim in addition to the paper title, title by possession. We say to you, however, that unless their papers show title to this property, they have shown no such possession here: continuous, adverse, hostile possession of this property, such property as it is, as would entitle them to rely upon the possession, if their papers do not cover the property. The possession of wild,

unimproved and uninclosed land is presumed to be in the party who has the title to the land, and an occasional trespass by others would not be, or a series of trespasses would not constitute, such hostile, adverse and exclusive possession as would deprive the owners of their title to the property. The law thus guards land of that character, and presumes the possession of property to be in those who have the title to it. So that, unless the defendants here have shown title to the property by their papers, we say to you that they have shown no such possession to it, without title, as would warrant you in finding that they had title to it by possession, adverse, exclusive, uninterrupted and hostile for a period of twenty-one years.] [3]

[If you find that the papers on both sides cover the land in dispute, then the defendants must satisfy you that they have been in possession of it by virtue of having held possession of the improved part of the tract to the exclusion of the plaintiffs. In other words, where a tract of land is partly improved and partly unimproved, the law draws the possession of the unimproved to that of the improved portion. If you are in possession of the improved portion of a tract of land, the law draws to you, also, the possession of the unimproved portion which is covered by your title. The defendants then, to have title of that kind, must have had exclusive possession of this land for a period of twenty-one years or more; the actual and exclusive possession of this piece of property, by virtue of having held possession of the improved portion of it, and drawing thus to that possession, the possession of the unimproved portion. To do that you would have to find that the plaintiffs did not have possession of this piece of land by virtue of having held possession of the improved portion of their land; for you must remember that it is said to be a part of a tract of one hundred and fifty acres, part of which is embraced within the lines of the Stewart survey, and the possession of this unimproved and uninclosed portion would be drawn to them the same as it would be drawn to the Shipley property.] [4] [In other words, if you should find that this uninclosed and unimproved portion of land is covered by both titles, and that the possession of it has been drawn to the Stewart property by virtue of their holding possession of the improved portion of the tract of which this unimproved is a part, then the defendants could

not ask your verdict in this case, because they have not shown a superior title to that piece as against the title of the plaintiffs.] [5]

[You will, therefore, have to ascertain in the first place, whether or not the defendants' papers cover the property where the tresspass was committed, and if they do cover it, whether or not the plaintiffs' papers cover it. If the plaintiffs' papers do not, and the defendants' papers do, then the defendants would be entitled to your verdict. If you find that the papers of both plaintiffs and defendants cover it, then you will have to ascertain whether the possession of it was held by the plaintiffs, by virtue of their having possession of the improved portion of the tract of which this forms a part, and if it was, then your verdict should be for the plaintiffs; because the defendants would not then have had the exclusive possession of it, and their title would be no better, at least, than that of the plaintiffs.] [6]

If you find in favor of the defendants on the question of title, of course that is the end of the case. But if you find in favor of the plaintiffs, then it will be your duty to assess the damage. . . . . .

On the part of the plaintiff we have been requested to charge you:

1. If the jury find from the testimony that the description in the patent to Andrew Stewart covers the land in dispute, then the title of Messmores would be superior to any shown in the defendants and the plaintiffs would be entitled to recover.

Answer: We charge you that that point is correct, unless you also find at the same time, that the defendants have been in the exclusive possession of this property during the statutory period of twenty-one years; such possession as I have indicated.[7]

2. If the jury find from the testimony that the patent to Andrew Stewart covers the land in dispute, then the defendants, and those under whom they claim, never having inclosed the premises in dispute, have not acquired any right to the same by any acts of ownership exercised by them, and their verdict should be for plaintiffs.

Answer: That is correct also, and is affirmed, providing you

don't find that that ownership of the uninclosed, that possession of the uninclosed, was drawn to the inclosed, exclusively by defendants, by virtue of their possession of the balance of the eighty-seven acres.[8]

The defendants have requested us to charge you:

1. That if the defendants, and those under whom they claim, have claimed the locus in quo for twenty-one years before suit brought, and have occupied the same as such land is usually occupied, openly, continuously, adversely and exclusively, during that time, the defendants' title thereto is good and the plaintiffs cannot recover.

Answer: We refuse to so charge you, because we have already charged you that unless you find that this is covered by their title papers, they have shown no such actual, exclusive, adverse and hostile possession as would give them title.[9]

The jury returned a verdict in favor of the plaintiffs for six cents damages and costs. A motion of the defendants for a new trial having been overruled, judgment was entered on the verdict, whereupon the defendants took this writ, assigning for error:

1, 2. The admission of plaintiffs' offers.[1] [2]

3-6. The portions of the charge embraced in [ ] [3 to 6]

7, 8. The answers to plaintiffs' points.[7] [8]

9. The answer to defendants' point.[9]

10. That the charge as a whole is contradictory, confused and misleading.

*Mr. Edward Campbell,* for the plaintiffs in error:

1. The admission of the sheriff's deed to John Huston for the land in dispute, as the land of Joseph Huston, without showing title in Joseph Huston, and judgment and execution against him, and of John Huston's deed to Andrew Stewart, was error: Little v. Delancey, 5 Binn. 266; Arnold v. Gorr, 1 R. 223; Green v. Watrous, 17 S. & R. 393; Eisenhart v. Slaymaker, 14 S. & R. 153; Drake v. Brown, 68 Pa. 223. The defendants' point should therefore have been affirmed, the plaintiffs' title being incomplete.

2. The assignments of error to the charge are mostly intended to point out the partiality of the court below toward the plaint-

iffs, its arguing to the jury for them, etc.  The court plainly intimated to the jury that in its opinion the defendants had no title at all, and its charge was about equivalent to a binding instruction to find for the plaintiffs.  The instruction covered by the third assignment, defendants submit, is not law.  Title by possession such as defendants show in this case, begins and ends simply in the possession, and defendants' papers have nothing to do with the validity of it.  The narrow strip of land in dispute is no more wild land than any other unfenced land is wild.  The rules concerning wild land, upon which the court based the charge, do not apply to it.

*Mr. A. D. Boyd* (with him *Mr. G. D. Howell* and *Mr. E. H. Reppert*), for the defendants in error:

1. The deed to John Huston from the sheriff was properly admitted as an ancient deed.  The recitals in an ancient deed, where the possession has not been contrary to it, are evidence of lost deeds: Garwood v. Dennis, 4 Binn. 314; Penrose v. Griffith, 4 Binn. 231; 1 Greenl. Ev., §§ 21–24, 143, 144, 570; Clark v. Miller, 89 Pa. 242; Lee v. Coal Co., 84 Pa. 74.  Recitals of mesne conveyances in a patent are evidence against one relying on possession alone, or claiming under a right which accrued subsequent to the date of the patent: Gingrich v. Foltz, 19 Pa. 38; Stewart v. Butler, 2 S. & R. 381; Star v. Bradford, 2 P. & W. 399; Read v. Thompson, 5 Pa. 327; Ross v. Marcy, 1 Clark 205.  The recitals in the patent to Andrew Stewart were, therefore, sufficient proof of his title.

2. The defendants sustain the assignments of error numbered three to nine, inclusive, by neither argument nor citation.  To show that there was no error, we cite : Mather v. Trinity Church, 3 S. & R. 507; Carlisle v. Stitler, 1 P. & W. 6; Burke v. Hammond, 76 Pa. 172.  Under these authorities, the legal title to wild and uncultivated lands, or a regular authorized survey thereof, gives the owner constructive possession, unless there be adverse possession, which must be evidenced by acts indicating permanency of occupation, such as residence and cultivation.  The court was not in error in designating this as wild land.  Land that is uncultivated, uninclosed, and covered with stone, native forest trees, under-brush, etc., is sufficiently wild for the purposes of this case.  The imputations against the fairness of the charge are unwarranted.

OPINION, MR. JUSTICE CLARK:

There is some evidence that the lands in dispute are embraced within the corrected boundaries of the John Lynch warrant, dated September 30, and surveyed December 2, 1815. The testimony as to the actual location of this survey is meagre, but there was perhaps sufficient to justify a submission to the jury, and the verdict is therefore conclusive upon that question. Besides, in the argument of counsel the fact appears to be conceded, and, as no question is made as to the sufficiency of the proof, we must assume that fact. The interference with the Joseph Gratz, an older warrant, surveyed September 9, 1794, was thrown out of the Lynch when the latter was surveyed for patenting in 1830; and the Lynch, properly located, without any interference with other original surveys, must, according to the verdict of the jury, be taken to embrace the premises in dispute.

The plaintiffs, having shown the warrant and survey to the John Lynch, gave in evidence a deed from sheriff Craft to John Huston, dated June 7, 1824, by the recitals of which it appeared to have been sold upon execution process as the property of Joseph Huston, and purchased by John Huston, who afterwards made a deed to Andrew Stewart, dated December 1, 1832; both of which deeds were duly executed, acknowledged, and recorded. These deeds purported to convey the land covered by the John Lynch warrant, but there were no intermediate conveyances connecting Joseph Huston with the Lynch title. The deeds were therefore only admissible to exhibit color of title and claim in Andrew Stewart, to whom a patent issued from the commonwealth April 3, 1833. The patent was followed by proof of settlement and actual occupancy of the Lynch by Andrew Stewart from the year 1822. In that year he erected a stone house, which has since been occupied as a tavern stand on the National turnpike. He also cleared and cultivated a portion of the tract, and it is shown that he has been in the continuous occupancy of the Lynch tract since that time.

The defendants claim title under Jonathan Downer, who, at an early day, settled upon the Joseph Gratz survey. About the year 1820 he built the Downer tavern stand, also on the National road, but further up the mountain, and remained in the occupancy and cultivation of the Gratz until the time of his

death. In the year 1846, proceedings in partition were institu-
ted in the court of Common Pleas of Fayette county upon the
estate of Jonathan Downer, deceased. An inquisition was tak-
en, and purpart B, known as the Downer Tavern Stand or
Chalk Hill, containing 87 acres and allowance, which embraced
the lands in dispute, was allotted to Jonathan Springer Downer;
but the sheriff's deed, by some arrangement, was afterwards
made to Samuel Shipley, and the defendants claim through a
series of conveyances from Shipley. The defendants' conten-
tion is that Downer died seised, not only of the Gratz, but of
that part of the Lynch now in dispute; that he, and those claim-
ing under him, have been in the actual and adverse possession
of the disputed land for a long period of years, and that their
title is good under the statute of limitations.

The patent to Andrew Stewart was prima facie evidence of
title: Lessee of James *v.* Betz, 2 Binn. 12; Bixler *v.* Baker,
4 Binn. 213. The patentee is regarded as a trustee for the
right owner: Hoffman *v.* Bell, 61 Pa. 444; but the patent con-
veys the full legal title of the state, and is evidence of title,
especially against one who relies on possession alone, who
shows no title, and whose rights, if any, accrued after the date
of the patent: Downing *v.* Gallagher, 2 S. & R. 455; Whit-
mire *v.* Napier, 4 S. & R. 290; Diggs *v.* Downing, 4 S. & R.
348; Gingrich *v.* Foltz, 19 Pa. 38; Balliot *v.* Bauman, 5 W.
& S. 150; Hull *v.* Campbell, 56 Pa. 154; Smith *v.* Vasbinder,
77 Pa. 127; Broad Top Coal Co. *v.* Coal Co., 65 Pa. 442, and
cases there cited.

The patent for the Lynch issued in 1833 to Stewart, who by
his tenants was then, and is now, in the possession of the tract, by
actual residence, cultivation, and improvement. Neither the
warrantee, nor any one claiming under him, comes forward to
impeach his title; nor is any adverse right or title shown to
have existed at the time the patent issued. Under such cir-
cumstances, the plaintiffs were entitled to stand upon the pat-
ent, and it devolved upon the defendants, under their claim of
adverse possession, to exhibit all the acknowledged requisites
of a possession efficient to bar the entry of the legal owner or
the holder of the title: Sheaffer *v.* Eakman, 56 Pa. 144.
Stewart, it is true, was not in actual possession, by residence
or cultivation, of that portion of the Lynch tract now in dis-

pute, but, as Chief Justice Lewis said in Hole v. Rittenhouse, 25 Pa. 492, "if any principle in the law of Pennsylvania can be regarded as settled by argument and authority, it is that which affirms that the legal title to uncultivated lands draws to it the possession, and that this possession is to be deemed actual, for all purposes of remedy, until it is interrupted by an actual entry and adverse possession taken by another." Moreover, Stewart being in the actual possession of the Lynch tract, by residence and cultivation, his possession extended to and covered the entire tract, according to the lines as they were found upon the ground. But it is essential to the validity of an adverse possession that there shall be an actual entry upon the land of the rightful owner, and an actual, visible possession taken of some part of it. Residence and possession, with cultivation on adjoining land, with boundaries including the valid title of another, will not give actual possession of the latter, although accompanied by the ordinary use of it as woodland, in connection with the part resided upon or cultivated. To maintain an actual possession to woodland as such, it is indispensable that the intruder take actual possession, by residence or cultivation, of a part of the tract to which the woodland belongs: Hole v. Rittenhouse, 25 Pa. 491, 37 Pa. 116. Actual possession may be by residence without cultivation, or by inclosure and cultivation without residence; and when there has been such actual possession taken of part of the land of another, under a bona fide claim, accompanied by a designation of boundaries, and the ordinary use of the woodland, and such use and possession is continued for 21 years, the intruder gains a title to all included within his lines. What constitutes an actual possession, such as creates an ouster and tolls the possession of another, has often been stated, and it does not consist in doing temporary acts upon the land without an intention to seat and occupy it for residence or cultivation, or for some other permanent use consistent with the nature of the property. Applying these principles, which are now so well settled as to be indisputable, to the case in hand, it is plain that the defendants' claim of title under the statute of limitations is wholly unfounded.

Jonathan Downer, about the year 1820, settled on the Joseph Gratz. There is no evidence whatever that his claim ex-

tended beyond the lines of that survey. It is certain that he took no actual possession of any part of the Lynch, either by residence, cultivation, or inclosure. He died some time prior to the year 1846, and then for the first time is there any definition of the boundaries of the Downer tract which would embrace the lands in dispute. This portion of the Lynch survey would then seem to have been embraced in the survey of the decedent's lands, was allotted with purpart B to one of the heirs, and was afterwards conveyed to Samuel Shipley. In no sense can it be said that Jonathan Downer died seised of the lands in dispute, for he had neither the title nor the actual possession; nor had he the title which would draw the possession to him by construction. Indeed, there is not the slightest evidence that he at any time claimed this land as his own, or denied the title of Stewart. The history of the defendants' claim of title begins with Samuel Shipley, who, under the proceedings in partition of the estate of Jonathan Downer, deceased, took the sheriff's deed for purpart B in 1847, and went into the possession under his deed in 1848. He says Stewart owned the land adjoining him on the east, and that the schoolhouse was 150 yards east of the line to which he claimed, and the Cool Spring 150 yards distant from the school-house; that the line to which he claimed ran east of the Cool Spring, and west of the school-house; from which it is fair to infer that his claim was in accordance with the lines in the partition plot, and according to the description in his deed. He says he chopped wood, made rails, and cut posts and fence-rails on the land about the Cool Spring; but the land was not cleared when he lived there, and there is no evidence that any part of the Lynch tract was since inclosed or cultivated by Shipley, or those claiming under him, until about the time of the bringing of this suit. Shipley says he cleared a couple of acres above the head of the Cool Spring, west of the spring, on the hill, at the place where an old road went from the Kentuck or Falls road down to the saw-mill; but, although he vaguely estimates the distance from the spring, he cannot say and does not know, that the clearing was on the land claimed by Stewart. If this clearing was made and maintained, it would have been an easy matter, by a proper location of the lines of the Lynch survey on the ground, to have shown whether it, or any considerable

portion of it, was within these lines. There was no such evidence; on the contrary, the proof is plain and wholly uncontradictory that this clearing was not on the Lynch tract at all. But, however this may be, there is not the slightest proof that this clearing was either inclosed or cultivated, or that it was such an encroachment upon the plaintiff's lands as should have arrested his attention. The cutting of fire-wood, making of rails, and even the clearing, were but so many single and separate trespasses, unless followed by residence, inclosure, or cultivation. Adverse possession of land may be said to be founded in trespass, but it must be a trespass constantly continued by acts on the premises. It must challenge the right to all the world. The claimant must, in the language of Mr. Justice GIBSON, "keep his flag flying, and present a hostile front to all adverse pretensions."

The burden of proof was upon the defendants to establish all the elements of a title by the statute, and, in the absence of proof to sustain any one of the requisites of such a title, it must be presumed not to exist. Samuel Shipley, in 1860, sold Chalk Hill to Millford Shipley, who entered into possession in 1861, and occupied the tract for eight years. He says he cut timber above the Cool Spring, both above and below the road, but his testimony is vague and uncertain as to the locality. The charge of the learned judge of the court below was much more favorable to their pretensions than the defendants deserved. Whilst we would be unwilling, perhaps, to adopt the reasoning of the charge as a correct exposition of the law of this case, the defendants certainly cannot complain of it.

The judgment is affirmed.