# Commonwealth, Appellant, *v.* Bierly.

*Deed—Estoppel—Land law—Warrant—Patent—Commonwealth's title to forest land—Forestry.*

Where a patent is issued by the commonwealth for land on an application alleging a vacancy, when in fact no vacancy exists, and subsequently the commonwealth takes title to the land for forestry purposes by mesne conveyances from the holder of the older warrant, a person claiming under the junior warrant cannot allege that as the junior patent was issued by the commonwealth for a valuable consideration, the commonwealth is estopped from afterwards acquiring by purchase the older title and setting it up to defeat its own later grant.

The rule that a grantor in a deed cannot set up a prior paramount title in himself against his own grantee applies only to a deed containing a warranty or covenant of title, and the estoppel is enforced merely to avoid a circuity of action. As a warranty and patent from the commonwealth contains neither warranty nor covenant for title, the rule is not applicable to these instruments, and as against them the commonwealth may set up a prior paramount title in itself.

A person who secures a patent from the commonwealth on an application which either mistakenly or falsely alleges that the land is vacant is in no position to claim that the commonwealth is estopped by reason of its patent from setting up a prior paramount title in itself. In such

a case there is an estoppel against an estoppel and the matter is at large.

*Adverse possession—Title—Burden of proof.*

Whilst the law raises no presumption against a title acquired by adverse possession, it certainly raises none in its favor. Upon him who asserts such a title, the burden of proof rests, with a constant pressure to establish, during the entire statutory period, the existence of every element out of which such a title must rise.

Title to land by adverse possession for twenty-one years, cannot be established by proof of one or two crops on a very small portion of the land during the first two years, and a somewhat continuous cultivation of the same small tract during the last six years of the holding.

Argued March 10, 1908. Appeal, No. 15, March T., 1908, by plaintiff, from judgment of C. P. Snyder Co., Dec. T., 1906, No. 34, on verdict for defendant in case of Commonwealth v. A. S. Bierly. Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ. Reversed.

Amicable action in trespass to recover damages for the cutting of timber trees. Before McCLURE, J.

The facts of the case are stated in the opinion of the Superior Court.

Verdict and judgment for defendant. Plaintiff appealed.

*Error assigned* was in refusing binding instructions for plaintiff.

*Philip B. Linn* and *Frederick E. Bower,* for appellant.— The Strouse tract, unseated, distinct from the Knepp, which was seated, must stand or fall by the testimony concerning the Strouse, and the court very properly so limited the effect of the testimony before the jury: Hole v. Rittenhouse, 19 Pa. 305; s. c., 25 Pa. 491; s. c., 37 Pa. 116; Waggoner v. Hastings, 5 Pa. 300.

As to the cutting of the timber there is no difference, as regards occupancy, between a solitary trespass and repeated trespasses, and the occupancy of a trespasser who does not cultivate and inclose continues no longer than he remains in contact with the soil: Wright v. Guier, 9 Watts, 172; Sorber v. Willing, 10 Watts, 141; DeHaven v. Landell, 31 Pa. 120.

The law casts upon the owner of unseated lands a constructive possession, which can only be defeated, upon the part of a trespasser, by an actual possession for the statutory period of twenty-one years: Rifener v. Bowman, 53 Pa. 313; McArthur v. Kitchen, 77 Pa. 62; Huffman v. McCrea, 56 Pa. 95; Groft v. Weakland, 34 Pa. 304; Rung v. Shoneberger, 2 Watts, 23; Washabaugh v. Entriken, 36 Pa. 513; Broad Top Coal & Iron Co. v. Coal & Iron Co., 65 Pa. 435.

As against the commonwealth estoppel does not arise: Com. v. Pittsburg Forge & Iron Co., 2 Pearson, 374; Taylor v. Shufford, 4 Hawks, 116; Reid v. State, 74 Indiana, 252; Mullan v. State, 34 L. R. A. 262; Bartholomew v. Lehigh County, 148 Pa. 82; Com. v. Phila. County, 157 Pa. 527; Evans v. Erie County, 66 Pa. 222; State v. Williams, 94 N. C. 891; State v. Bevers, 86 N. C. 588; People v. Brown, 67 Ill. 435; Farish v. Coon, 40 Cal. 33; Wolfe v. Reynolds, 80 Pa. 204; Burd v. Seabold, 6 S. & R. 137; Smith v. Vasbinder, 77 Pa. 127; Cullen's Estate, 142 Pa. 18; Bagley v. Wallace, 16 S. & R. 245; McKeehan v. Commonwealth, 3 Pa. 151; Commonwealth v. Hutchinson, 10 Pa. 466; Commonwealth v. Johnson, 6 Pa. 136.

*A. W. Potter*, with him *M. I. Potter*, for appellee.—The clearing, inclosing and cultivation of this field, and the using of the woodland in the manner clearly shown by the testimony, brings this case within the scope of the decisions in all the more recent cases: Ament v. Wolf, 33 Pa. 331; Sholly v. Stahl, 2 W. N. C. 418; Hollinshead v. Nauman, 45 Pa. 140; Mason v. Ammon, 117 Pa. 127; Douglas v. Irvine, 126 Pa. 643.

We confidently maintain that the commonwealth is bound by the same rules of common honesty which control the conduct of individuals; and that the commonwealth is therefore estopped to set up the title it acquired from Pardee originally granted out in 1794, to defeat the title it granted out to Knepp and Strouse in 1838 and 1840; and we submit the following authorities as ruling the question in favor of our contention: Root v. Crock, 7 Pa. 378; Commonwealth v. Smith, 2 Clark, 335; Penrose v. Griffith, 4 Binn. 231.

OPINION BY HEAD, J., December 7, 1908:

This amicable action of trespass was begun, nominally, to recover damages for the cutting of a few timber trees, but really to test the title to the tract of land upon which they grew.

As early as 1794 eight warrants issued out of the land office, for as many separate tracts of land situate chiefly in Snyder county. Each tract contained about 400 acres. They were regular in shape and surveyed in two tiers of four tracts each, the one tier lying immediately north of and adjoining the other. Each warrant was followed by a patent. By many mesne conveyances not necessary to be noted, the title to the entire block became duly vested in Ario Pardee and, upon his death, descended to his heirs at law. In 1901 the commonwealth purchased all of these tracts for forestry purposes, and went into possession. It was thus enabled to make out a clear prima facie case resting on a written and recorded title.

In 1838 and 1840 respectively, Henry Knepp and John Strouse filed applications, alleging the existence of a body of vacant land in the portion of Snyder county they described and warrants issued, to the former for about fifty-four acres, to the latter for about 138 acres. The surveyor, who undertook to locate these warrants, laid them down, speaking generally, along and on both sides of the centre line of the older block of warrants already mentioned. With the Knepp warrant we have no direct concern, the title to the land covered by it not being involved in this case. Excluding the extreme southeastern corner of the Strouse tract, it appears that tract was a long narrow strip of land, almost rectangular in shape, overlapping and embracing parts of the Jesse Hoops, Joseph Moore and Joseph McClellan warrants in the northern tier of the older batch; and of the Catharine Bishop, John Bishop and Elizabeth Traxell warrants in the southern tier. In a word, there was no vacant land at the place described in the application and warrant of Strouse. The title to every acre of it had passed out of the commonwealth forty years before. Under these circumstances it is conceded that Strouse took no title whatever and when he entered upon the land he was simply an intruder on the real owners.

Strouse, having acquired the interest of Knepp in his warrant, took out a single patent covering both. He, or his successors, made a permanent improvement on the Knepp warrant, resided there, cleared and cultivated considerable portions of it and have ever since remained in undisturbed possession of it. No residence was ever established on the Strouse tract; with the exception of the small corner, to which we will later refer, it was never cleared nor cultivated and remains, to the present time, woodland.

Against the unbroken, written and recorded title of the plaintiff in this action defense is made on two separate and distinct grounds. It is first contended by the defendant that although Strouse, by his junior warrant and the patent following, took no title as against the then owner, whose title rested on the elder warrants, nevertheless, because his warrant and patent were issued to him by the commonwealth, for a valuable consideration, the latter is estopped from afterwards acquiring, by purchase, the older title and setting it up to defeat its own later grant.

We are unable to accede to the proposition that the conditions here presented invite the application of the legal principle thus invoked. The commonwealth was not a grantor within the meaning of that principle. Its warrant was not intended and did not purport to vest in Strouse any interest whatever in any land previously warranted to another. It simply authorized a survey, for his benefit, of the number of acres at the place mentioned in his application, "if not already surveyed or appropriated." In granting this warrant the commonwealth was not a volunteer. It asserted no fact by which Strouse was misled to his injury. On the contrary the warrant rested upon his own application, in which he declared that the land applied for was vacant, and he fortified his assertion, in this respect, not only by his own oath, but by the affidavit of a "disinterested witness," one Peter Knepp, who declared "that to his certain knowledge the land described in the above application is unimproved and as he verily believes not heretofore claimed by any other person."

Upon the filing of such an application, the land laws of

the state neither required nor authorized an independent investigation by the land office to ascertain the truth of the basic fact asserted in it. The warrant issued, as of course, and the responsibility for the result that, if the land had been previously appropriated no title passed, was left and properly left to rest with the applicant who had voluntarily assumed it. Under such circumstances we cannot see how Strouse could have successfully invoked the aid of the doctrine of equitable estoppel to ward off the consequences that necessarily flowed from his own mistaken or false representation that the land applied for was vacant land. If he could not, the defendant, whose rights in this respect rise no higher than his, cannot.

This conclusion is strengthened if we glance briefly at the reason on which the rule of the law, in such cases, is founded. The rule itself is well stated in the following language taken from 11 Am. & Eng. Ency. of Law (2d ed.), 402, 403, in an article where the entire subject is reviewed and many cases cited: "The rule has been laid down that if a man has made a solemn deed with covenants of seizin and warranty, or for quiet enjoyment and further assurance, it shall never lie in his mouth to dispute the title of the party to whom he has so undertaken, as for instance, by setting up a prior paramount title in himself or in a third person." And the reason of the rule is thus stated by ROGERS, J., in Shaw v. Galbraith, 7 Pa. 111: "Circuity of action, as my Lord Coke says, Co. Litt. 265a, is not favoured in law. The principle is founded on this consideration, that it would be against equity to allow the grantor to recover the land, thereby breaking his covenant and exposing himself to an action to recover its value. The principle is recognized in several analogous cases. Thus in McCrackin v. Wright, 14 Johns. 193, and in Jackson v. Bradford, 4 Wend. 619, it is ruled: That, in a deed of bargain and sale, no estate passes, except what is in esse at the time of the grant; but where title is afterwards acquired and there is a warranty in the deed, *to avoid circuity of action* it operates as an estoppel. Where there is a warranty in the deed, the warranty will rebut and bar the grantor and his heirs of a future right. This is not, as is there said, because the title ever passes by such grant;

but the principle of avoiding circuity of action interposes and stops the grantor from impeaching a title, to the soundness of which he must answer on his warranty."

From this it would logically follow that the rule has no application to the maker of a mere quitclaim deed containing none of the covenants above referred to. And so the law hath been declared to be: Bigelow on Estoppel, 384.

Under our land laws the warrantee in a descriptive warrant becomes vested with an inchoate title to the land as soon as his warrant issues. The survey, its return and acceptance, and the payment of the purchase money ripen this into a perfect title as "against all the world but the commonwealth, which has itself the legal title only as security for the patenting fees. On the payment of them, the owner has a right to a patent, which, however, as to all third persons, gives him no better title than he had before. The patentee, like the Commonwealth, is but a trustee for the true owner:" Hoffman v. Bell, 61 Pa. 444. See also Kelly v. Graham, 9 Watts, 116; Canal Co. v. Dimock, 47 Pa. 393. When we thus consider the warrant and patent, either with an eye to their form and structure, or to their nature and effect, it appears that neither contains any one of the covenants that would justify the application to them of a rule of law which exists only to prevent the breach of such covenants.

But even if Strouse, the patentee, were in a position to invoke the aid of the rule we have been considering, he himself should be estopped from doing so because, as we have seen, he was the original actor in the transaction and ought not to be permitted to gain any advantages from the acts of the state's officers, when those acts were brought about by his own mistake or misrepresentation as to the character of the land described in his application. "The setting up of an estoppel by deed may be prevented by an estoppel in pais as against the grantee. An estoppel against an estoppel, as Lord Coke says, setteth the matter at large:" 11 Am. &. Eng. Ency. of Law (2d ed.), 392.

Whilst, in the record before us, the question we have been discussing is somewhat irregularly presented, yet recognizing

its wide reaching importance to the state, in attempting to carry out the broad policy inaugurated by the legislature in the creation of the forestry commission, we have thought it best to give it our attentive consideration and state, at some length, the reasons that lead us to the conclusion we have reached.

Upon the trial the defendant relied mainly, if not entirely, on a title acquired under the statute of limitations. It appeared that in 1883, or just prior to that year, Pardee, the rightful owner, having learned that timber was being cut on his lands, sent a party of surveyors and others to ascertain the facts. They went, inter alia, upon the land covered by the Strouse warrant and patent, ran its lines, counted and measured the trees and timber that had been cut and made a report to Pardee.

He issued a capias in trespass against Joseph H. Knepp, who was the successor in title to Strouse. From testimony, practically undisputed, it appears that Knepp, in response to that writ, went to Lewisburg and made an amicable settlement with Pardee for the timber thus charged to have been cut. The learned trial court held, and we think rightly, that the institution of this action would toll the statute, but submitted to the jury to find, from all the evidence, whether or not a complete title, by adverse possession, had accrued to the successor of Strouse, prior to the bringing of the action. The plaintiff, alleging there was no sufficient evidence to warrant an adverse finding in this respect, craved binding instructions in favor of the commonwealth.

Whilst our law raises no presumption against a title acquired by adverse possession, it certainly raises none in its favor. Upon him who asserts such a title, the burden of proof rests, with a constant pressure, to establish, during the entire statutory period, the existence of every element out of which such a title must rise. His situation is well described by CLARK, J., in Olewine v. Messmore, 128 Pa. 470, in the following language, viz.: "Adverse possession of land may be said to be founded in trespass, but it must be a trespass constantly continued by acts on the premises. It must challenge the right

to all the world. The claimant must, in the language of Mr. Justice GIBSON, 'keep his flag flying and present a hostile front to all adverse pretensions.' "

We have already seen that no residence was ever established by any one on the Strouse warrant as distinguished from the Knepp warrant. If any possession, legally speaking, was ever taken of the former it was by those who claimed and finally established title to the latter. It does not appear that any of the witnesses, who testified for the defendant, knew, until in recent years, the location of the division line between the two warrants. As a result of this much of the evidence is so vague, as to locality, that it is impossible to determine whether it applied to the land on the one side or the other of the division line. Giving to the defendant, however, the benefit of every inference that can rightfully be drawn from the facts testified to, concerning the land embraced in the Strouse warrant, it appears that Strouse conveyed to one William Steininger by a deed which was never recorded, and was destroyed by fire long before the trial. He established a residence on the Knepp warrant and began to clear and cultivate that tract, but the evidence discloses no entry by him on the Strouse warrant. He was succeeded by his son Eli, who also resided on the Knepp warrant. There is evidence to support a finding that about 1860 or 1861 he made an encroachment on the Strouse warrant and cleared and fenced a small patch, containing from three to seven acres, just across the division line. His daughter Mrs. Wagner testifies that she helped to clear land, probably although not certainly over the line, and saw wheat and corn growing there. She does not attempt to give any date nor say whether both crops grew in the same year on parts of the patch or in different years. Joseph Snook testified he worked for Steininger in 1860 and 1861; that there was cleared and fenced a field on land now claimed by the state, "about three acres or along there;" and that to his knowledge Steininger one year had a crop of corn in that field.

Steininger sold to Nerr Bishop probably in the fall of 1874, and the latter held this title until in 1876 when he sold to

Wagner, the son-in-law of Steininger. Bishop never culti-
vated this land nor does he know of any crops being raised on
it. He says "it was not what we call farming land;" it was
badly grown up in brush and briars, "but it was pretty good
land when you got it cleared up a little."

Wagner testifies that he farmed this land whilst he had it
from 1876 to 1880, "had it out in wheat, corn and oats them
four years that I lived there." Rev. Dean testifies he saw that
clearing on the Strouse tract thirty to forty years before 1907;
that he once saw potatoes and buckwheat there, but "I didn't
see any crops on after that, on that field." Joseph Knepp, who
acquired this title about 1880 or 1881, knew the land when
Steininger lived there; knew the cleared patch above the state
line and saw Steininger once have that in corn and wheat.
M. L. Wert learned recently the location of the state line;
he testified that he had seen cleared land above it, about four
acres; had the appearance of an old field, but never saw a
crop growing on it.

Passing by without comment the testimony of one or two
witnesses that furnished nothing of value towards establishing
the main point in controversy, we have now before us all of
the substantive proof that the defendant was able to offer in
support of his theory that, during a period of twenty-one con-
secutive years or more, prior to 1883, his predecessors in title
had continuously maintained adverse possession, by cultiva-
tion, of a portion, however small, of the Strouse warrant.

If we subtract, from the testimony we have adverted to,
that which applies only to the last six years of the period, from
1876 to 1882, it must be apparent we have, in what remains, a
foundation too scant and weak to support, during fifteen years,
a possession by cultivation that must have been not only open,
visible and hostile, but continuous and uninterrupted. In
Sorber v. Willing, 10 Watts, 141, GIBSON, C. J., says: "Now to
leave the fragments of a ruined sawmill on the land, is no more
indication of a retained possession, than to leave the fragments
of a ruined fence on it, or a waste field with sprouts and sap-
lings."

Had the rightful owner gone upon his land in 1874–75 and

observed, with his own eyes, the conditions described by Bishop, the defendant's witness and predecessor in title, he would have seen no "flag flying" to warn him of a then present hostile occupancy of his land by a stranger, and to challenge him to put his right to the proof or lose it. Even if we do not regard the statement of Bishop, although uncontradicted, as conclusive upon the defendant, it cannot be denied that it is overwhelmingly corroborated by the very meagerness of the proof of the extent of the cultivation in the preceding years.

We are not unmindful of the fact that our courts, in construing the term "cultivation," have recognized that, in the customary rotation of crops and the proper care of tilled land, the soil must occasionally, for a reasonable period, be permitted to rest from the burthen of the annual production of harvests. But we can find neither reason nor authority for the proposition that an intruder, basing his claim on an alleged continuous cultivation of the land for twenty-one years or more, should recover as against the rightful owner, where the record exhibits the paucity of proof that here confronts us.

We are of the opinion therefore that the evidence submitted by the defendant was insufficient to make out all of the essential ingredients of a good title by adverse possession and the learned trial court should have affirmed the plaintiff's point for binding instructions. The damages fixed by the testimony were nominal, $1.00, and as the action was amicable, to test the question of title, a judgment for such nominal damages will settle the real controversy.

The judgment is reversed and judgment is now entered for the plaintiff for $1.00 damages, together with costs of suit; the costs of this appeal to be paid by the appellee.