**UNITED STATES v. UNITED STATES GYPSUM CO. et al.**
**Civ. A. No. 8017.**

District Court of the United States for the District of Columbia.

Nov. 15, 1943.

See, also, 51 F.Supp. 613.

Roscoe T. Steffen and Edward Knuff, Sp. Assts. to Atty. Gen., for plaintiff.

Bruce Bromley, of New York City, and Hugh Lynch, Jr., of Washington, D. C., for defendants United States Gypsum Co., Sewell L. Avery and Oliver M. Knode.

Nicholas J. Chase, of Washington, D. C., and Elmer E. Finck, of Buffalo, N. Y., for defendants National Gypsum Co., and Melvin H. Baker.

Harold F. McGuire and F. W. H. Adams, both of New York City, and Leonard B. Ettelson and Stephen Allie, both of Chicago, Ill., for defendants Certainteed Products Corporation and Henry J. Hartley.

Walter G. Moyle and Ernest H. Oliver, both of Washington, D. C., and Andrew J. Dallstream and Norman Waite, both of Chicago, Ill., for defendants Celotex Corporation and Bror G. Dahlberg.

Joseph P. Tumulty and Joseph P. Tumulty, Jr., both of Washington, D.C., and Alfred W. Varian and Herbert M. Simon, both of New York City, for defendants Ebsary Gypsum Co., Inc., and Frederick G. Ebsary.

James O'Donnell, Jr., of Washington, D. C., and Benjamin P. DeWitt, of New York City, for defendants Newark Plaster Co. and Frederick Tomkins.

George E. H. Goodner and Scott P. Crampton, both of Washington, D.C., and D. I. Johnston, Roy C. Lytle, James R. Keaton, and Frank Wells, all of Oklahoma City, Okla., for defendant Samuel M. Gloyd, doing business under trade name of Texas Cement Plaster Co.

Before STEPHENS, Associate Justice, United States Court of Appeals for District of Columbia (Presiding), and BLAND and GARRETT, Judges, United States Court of Customs and Patent Appeals, designated as Justices of the District Court of United States for District of Columbia.[1]

STEPHENS, Associate Justice.

This action, commenced by the United States, hereafter for convenience referred to as the Government, on August 15, 1940, is for equitable relief under Section 4 of the Sherman Act. The complaint charges that the defendants have been engaged in a combination and conspiracy in restraint of trade and commerce in gypsum products in violation of Sections 1, 2 and 3 of the Act.[2] It is alleged that the combination and conspiracy have been carried out in connection with certain patent license agreements based on patents owned by the United States Gypsum Company covering the manufacture of gypsum board. Upon these license agreements the defendants themselves rely as properly establishing prices and terms of sale of gypsum board within the doctrine of United States v. General Electric Company, 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. On March 12, 1943, the Government was permitted by an order of this court to amend its complaint by adding a paragraph 46(a) attacking the validity of the patents upon which the license agreements are based. The paragraph is in the following terms:

"46a. Many of the patents mentioned and described in said license agreements by which the said combination has been, and is being carried out in part, are process or machine patents. The article and product claims of Roos patents No. 2,017,022, No. 2,079,338, No. 2,080,009, No. 1,914,345, and No. 1,938,354 mentioned and described in said license agreements, and said patents, are each invalid and void for each of the following reasons: (a) there is no real invention or novelty in the claims of said patents; (b) the claims of said patents disclose no patentable invention in view of the prior art at the time the respective applications were filed; (c) the alleged inventions described in the claims of said patents were shown and described in printed publications in the United States more than two years prior to the filing of the respective applications; (d) the alleged inventions described in the claims of said patents are inoperative and devoid of novelty or utility; (e) the alleged inventions described in the claims of said patents were abandoned by the inventor and he was guilty of laches before the respective applications were filed; (f) the alleged inventions described in the claims of said patents were not reduced to practice until after other inventors had invented and reduced the same to practice and applied for patents thereon; (g) the said alleged inventions are described in ambiguous and not in properly clear, concise and exact terms and; (h) the defendants have been informed of the invalidity of the claims of the said patents and have unreasonably failed to file in the United States Patent Office any disclaimer of such claims. The said patents mentioned and described in the said license agreements, even assuming they are valid, are not basic article or product patents and do not singly or all together cover completely the business of mining and selling gypsum, or cover completely gypsum board, which is one of the forms in which unpatented gypsum is sold by the defendants, but at most constitute minor additions to the established and unpatented art of making gypsum board and afford no legal justification for the said combination."

The order allowing this paragraph to be added to the complaint was made expressly without prejudice to the right of

---

[1] Holding a three-judge statutory court pursuant to the provisions of 15 U.S. C.A. § 28, as amended by the Act of April 6, 1942, Public No. 515, 77th Congress, 2d Sess., 56 Stat. 198.

[2] 26 Stat. 209 (1890), as amended by 36 Stat. 1167 (1911), 50 Stat. 693 (1937), 15 U.S.C.A. §§ 1, 2, 3, 4.

the defendants to question the legal sufficiency of the allegations, and it was urged by counsel for all parties that a ruling upon this question should be made prior to the commencement of trial in order that counsel might be advised as to the necessity of preparation for attack upon, or defense of, the validity of the patents. The defendants accordingly filed this motion to strike or for partial judgment. The motion is one, pursuant to Rule 12(f) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, to strike paragraph 46(a) upon the ground that the allegations thereof are immaterial and impertinent to the issues in the case; and the motion is made, in the alternative, under Rules 12(b) and 56(b) for partial judgment dismissing that part of the Government's claim contained in paragraph 46(a) upon the ground that as a matter of law the Government may not attack the validity of the patents in this proceeding in the manner attempted. It is conceded that the five patents mentioned in the paragraph were issued by the Commissioner of Patents, sometimes hereafter referred to as the Commissioner, and that none of them has heretofore been held invalid by any court. The dates of application and issuance of the Roos patents are: No. 2,017,-022, application filed August 20, 1924, patent issued October 8, 1935; No. 2,079,338, application filed January 19, 1925, patent issued May 4, 1937; No. 2,080,009, application filed October 16, 1926,[3] patent issued May 11, 1937; No. 1,914,345, application filed July 7, 1932, patent issued June 13, 1933; No. 1,938,354, application filed March 15, 1933, patent issued December 5, 1933. The patents are each in the usual form, set forth in the margin.[4] It is not charged by the Government in its complaint that the issuance of the patents was obtained by fraud or any other wrongful act. What the Government asserts, in essence, is that, for the reasons set out in paragraph 46(a), the Commissioner erred in issuing the patents. It is to be noted further that the attack upon the validity of the patents, in this aspect of the case, is not upon the ground that they are invalid because being used in violation of the Sherman Act; it is the converse, that the Sherman Act is being violated, through the license agreements, because the patents upon which the agreements are based are invalid. It is also to be borne in mind that, while this is not an independent cancelation proceeding, but an antitrust suit in which the Government contends that the patents are invalid, nevertheless the Government is seeking a judicial determination that the Patent Office erred in issuing the patents and that they are for that reason invalid. This was conceded in

[3] Original application January 19, 1925, which was a division of the August 20, 1924, application.

[4]
No. 2017022
The United States of America
To All To Whom These Presents Shall Come:

Whereas Carlisle K. Roos, of Fort Dodge, Iowa, assignor to United States Gypsum Company, of Chicago, Illinois, a corporation of Illinois, presented to the Commissioner of Patents a petition praying for the grant of Letters Patent for an alleged new and useful improvement in Cementitious Materials, a description of which invention is contained in the specification of which a copy is hereunto annexed and made a part hereof, and complied with the various requirements of law in such cases made and provided, and

Whereas upon due examination made the said Claimant is adjudged to be justly entitled to a patent under the Law.

Now therefore these Letters Patent are to grant unto the said United States Gypsum Company, its successors or assigns for the term of Seventeen years from the date of this grant the exclusive right to make, use and vend the said invention throughout the United States and the Territories thereof.

[Seal]

In testimony whereof I have hereunto set my hand and caused the seal of the Patent Office to be affixed at the City of Washington this eighth day of October, in the year of our Lord one thousand nine hundred and thirty-five, and of the Independence of the United States of America the one hundred and sixtieth.

Attest:

Conway P. Coe
Commissioner of Patents

H. S. Miller
Law Examiner.

Roos patent No. 2,079,338 is in haec verba, as are the other patents except that No. 2,080,009 is for an improvement in plaster wallboards and methods of making them; No. 1,914,345 for an improvement in wall construction; and No. 1,938,354 for an improvement in fire-resistant wall and ceiling structures.

the oral argument. And the Government's prayer, asks cancelation of the provisions of the license agreements, asks that the defendants be perpetually enjoined from entering into any license agreements containing similar provisions, and that the defendants be enjoined from bringing any action for infringement of any of the patents now owned or controlled by them, and from attempting to collect royalties or license fees or profits for the use of the patents now owned or controlled by them, until it is made to appear to the court that all improper practices have been abandoned and the consequences of all misuses of the patents have been dissipated, and that the defendants be enjoined from entering into any license agreements relating to gypsum products without first obtaining the consent of the court. Accordingly, so far as the effect upon the defendants and the patents is concerned, the distinction between this suit and an independent cancelation proceeding is not substantial.

The essential question raised by the motion is whether or not the Government, in an antitrust proceeding prosecuted by its Department of Justice, can seek a determination that the Commissioner erred in issuing patents relied on by the defendants as a foundation for license agreements, and that the patents are therefore invalid, it not being charged that the action of the Commissioner was obtained by fraud.[5] The question involves inquiry into the authority of the Government to question its own action, and into the power of the court to review an administrative determination.

### I.

No statute answers the question. The Act of June 25, 1910, 36 Stat. 851, 35 U.S.C.A. § 68, providing that whenever an invention covered by a United States patent is used or manufactured by the United States itself without license of the owner, or lawful right, the owner's remedy shall be by a suit against the United States in the Court of Claims for compensation and that in such suit the United States may avail itself of any defense that might be pleaded by a defendant in an action for infringement, contemplates, when read in connection with Rev. Stat. § 4920 (1875), 35 U.S.C.A. § 69, a defense based upon the ground that the patent was erroneously granted—thus allowing the Government to question the action taken by its own official, the Commissioner of Patents. Cf. Richmond Screw Anchor Co. v. United States, 1928, 275 U.S. 331, 48 S.Ct. 194, 72 L.Ed. 303. But this statute is obviously not pertinent here. The Government is not in this case defending against accusation of infringement.

### II.

There is no controlling judicial decision directly in point. In United States v. Porcelain Appliance Corp., unreported (N.D. Ohio E.D. Sept. 9, 1926), an antitrust proceeding to dissolve an allegedly illegal combination, the court denied a motion to strike from the Government's bill allegations pertaining to the validity and scope of patents. The court reasoned that, while the suit was not one to cancel patents and it was probably beyond the scope of all possible issues to decree patents or patent claims to be void, it was conceivable that patents invalid or limited in nature, in view of the prior art, might be wrongfully used in building up an illegal combination, and that whether the case was of such nature as to permit or require inquiry into questions of validity or scope of patents could not be determined adversely to the plaintiff on a motion to strike out. The court did not, however, discuss the essence of the matter, i.e., the question whether the Government can raise an issue as to the validity of its own action in granting patents, and the case is not, therefore, of persuasive value; and, as it is a District Court decision, and is from another jurisdiction, it is not controlling.

Other cases principally relied upon by the Government are the following, which are here enumerated, for convenience, in the order in which they will be discussed: United States v. Standard Oil Co., D.C. N.D.Ill.1929, 33 F.2d 617, reversed on other grounds, 1931, 283 U.S. 163, 51 S. Ct. 421, 75 L.Ed. 926; Crosby Steam Gage & Valve Co. v. Manning, Maxwell & Moore, Inc., D.C.D.Mass.1943, 51 F.Supp. 972; Sola Electric Co. v. Jefferson Electric Co., 1942, 317 U.S. 173, 63 S.Ct. 172; United States v. Socony-Vacuum Oil Co., 1940, 310 U.S. 150, 60 S.Ct. 811,

---

[5] The term "invalid" as applied to patents issued in error is a misnomer. Strictly such a term should be applied only to patents obtained by fraud, or wholly beyond the jurisdiction of the Commissioner. But the term is constantly used in the authorities in application to patents issued in error, and for convenience and verbal consistency, will be so used herein.

84 L.Ed. 1129; United States v. Univis Lens Co., 1942, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; United States v. American Bell Telephone Company, 1897, 167 U.S. 224, 17 S.Ct. 809, 42 L.Ed. 144. In United States v. Standard Oil Co., an antitrust injunction suit alleging restraint of trade by virtue of agreements dealing with the right to use patented processes and apparatus, a master certified to the District Court the question of the admissibility of evidence offered by the Government to show lack of patentability in respect of two patents, and the court directed that the evidence be received. Later, in considering the master's report, which was favorable to the defendants on all issues, including that of validity of the patents, the District Court did not pass upon the patent validity question, stating that it was "divided respecting the right of the government to attack the validity of the patents in these proceedings. * * *" (33 F.2d at page 623). Otherwise, the District Court reversed the decision of the master on the merits and the defendants then appealed to the Supreme Court which reversed the District Court. But the Supreme Court likewise did not pass upon the question of patent validity. The case therefore constitutes no ruling of any value, on the question now before this court. In Crosby Steam Gage & Valve Co. v. Manning, Maxwell & Moore, Inc., the United States was allowed to intervene in an action brought by a patentee to collect royalties, the defense in the action being that the license agreement had been validly terminated by the defendant because it violated the Sherman Act and because the patents upon which it was based were invalid. This decision again, however, constitutes no direct ruling except that a court may properly exercise its discretion to allow Government intervention in such an action as described. The court did not rule that the Government as intervenor would be allowed to introduce evidence to the effect that the patents were invalid. Indeed, it appears from the opinion that the Government had informed the court that if allowed to intervene it would be chiefly concerned with directing the attention of the court "first to the operation of this and similar license contracts made by plaintiff, and second to the form of de-

cree which the Government deems appropriate." (51 F.Supp. at page 973). It is clear from the opinion that the court did not have in mind in allowing the intervention, and was not ruling upon, the question now before this court, i.e., whether the Government can attack the validity of patents which the Government itself has, through its Commissioner, granted. Sola Electric Co. v. Jefferson Electric Co. holds that if the price fixing provisions of a patent license agreement are, if not within the protection of a lawfully granted patent monopoly, violations of the Sherman Act, a patent licensee sued for royalties may offer evidence of invalidity of the patents upon which the license agreement is founded, notwithstanding rules of estoppel, whether local or Federal, which would otherwise forbid him, because of his license agreement, to do so. But this is not a ruling that the Government itself may in a Sherman Act proceeding attack the validity of patents which it has issued through the Commissioner. The attack in Sola Electric Co. v. Jefferson Electric Co. was by a private party. In respect of United States v. Univis Lens Co., Ethyl Gasoline Corp. v. United States, and United States v. Masonite Corp., the reliance of the Government in the instant case is upon mere dicta uttered in cases decided in terms of the question whether licensing and price fixing arrangements were or were not within the proper limits of a patent monopoly, but in which no question of validity of patents was raised.

In United States v. American Bell Telephone Company, [167 U.S. 224, 17 S.Ct. 820, 42 L.Ed. 144] the Government relies in particular upon the following language in the opinion of Mr. Justice Brewer:

"Suits may be maintained by the Government in its own courts to set aside one of its patents not only when it has a proprietary and pecuniary interest in the result, but also *when it is necessary in order to enable it to discharge its obligations to the public,* and sometimes when the purpose and effect are simply to enforce the rights of an individual. In the former cases it has all the privileges and rights of a sovereign. The statutes of limitation do not run against it. The laches of its own officials does not debar its right. Van Brocklin v. Tennessee, 117 U.S. 151 [6 S.Ct. 670, 29 L.Ed. 845]; United States v. Nashville, Chattanooga &c. Railway, 118 U.S. 120 [6 S.Ct. 1006, 30 L.Ed. 81];

United States v. Insley, 130 U.S. 263 [9 S.Ct. 485, 32 L.Ed. 968]. But when it has no proprietary or pecuniary result in the setting aside of the patent; *is not seeking to discharge its obligations to the public;* when it has brought the suit simply to help an individual; making itself, as it were, the instrument by which the right of that individual against the patentee can be established, then it becomes subject to the rules governing like suits between private litigants. * * *" (167 U.S. at pages 264, 265, 17 S.Ct. at pages 819, 820, 42 L.Ed. 144). (Italics supplied).

When read alone this language seems to lend aid to the Government's contentions in support of paragraph 46(a), but when read in the context of the opinion and decision as a whole it is clear that it is not in conflict with the holding of the Supreme Court in the case. The holding is that while the Government may, in a direct cancelation proceeding, attack a patent on the ground that it was obtained by fraud, it may not secure a determination that it was issued in error. This case is discussed in greater detail below.

### III.

■ In addition to relying on the cases discussed above, the Government in support of its right to attack the validity of the patents referred to in paragraph 46 (a) makes four contentions of law. The first of these is that the Government when prosecuting an antitrust suit is acting in a sovereign as distinguished from a proprietary capacity and is hence not subject to local rules of estoppel. It is true that the Government is suing in sovereign capacity. But to say this does not answer the question before the court. The question is not really one of estoppel, which assumes a right but forbids its exercise. The question is a deeper one—whether the Government, having once issued these patents through the Commissioner of Patents, has any authority founded upon statute, case or principle to repudiate its own action in so doing, or whether the courts have power, at the instance of the Government, to review the action of the Commissioner, in issuing the patents, in the absence of a charge of fraud in the obtaining of the same. It is to be noted in this connection that the grant of a patent is as much a sovereign act as the prosecution of an antitrust suit.

■ The second contention is that the present action, including the relief sought under paragraph 46(a), is not a collateral attack upon the action of the Commissioner in granting the patents but a direct attack upon price fixing, in which the fact of invalidity of the patents may incidentally be shown and determined. But again, to demonstrate that the attack is incidental to a direct attack upon price fixing does not any more answer the question raised by the present motion than to say that the attack is sovereign. The fundamental question still remains: Where does the Government find the authority to question, even in an antitrust proceeding and incidentally, its own action once taken through the Commissioner of Patents, there being no charge of fraud in the obtaining of the patents; or where does a Federal court find its power to review the action of the Commissioner at the instance of the Government.

The cases principally relied upon by the Government under this aspect of its argument—Pratt v. Paris Gas Light & Coke Co., 1897, 168 U.S. 255, 18 S.Ct. 62, 42 L.Ed. 458; Becher v. Contoure Laboratories, Inc., 1929, 279 U.S. 388, 49 S.Ct. 356, 73 L.Ed. 752; United States v. Bradford, C.C.E.D.La. 1905, 148 F. 413, affirmed per curiam, 5 Cir., 1906, 152 F. 616, certiorari denied 1907, 206 U.S. 563, 27 S.Ct. 795, 51 L.Ed. 1190—do not answer these questions. The first two of these three cases correctly hold that, although a court does not have primary authority to deal with a question of patent invalidity, it may nevertheless determine such a question in a case in which it otherwise has power over the subject matter and parties. And all three of the cases correctly decide, stating their holding in general terms, that a court may incidentally determine a question of fact in a case in which the court has primary jurisdiction of the subject matter and parties even though it might not have authority to make such determination in a direct suit for that purpose. But obviously these cases do not decide the question involved in the instant motion to strike because in none of them was the incidental question raised by the very person whose action was being questioned. In Pratt v. Paris Gas Light & Coke Company the attack upon the validity of the plaintiff's patent was made by the defendant, a private party, and the same is true in Becher v. Contoure Laboratories, Inc. In neither case was the Government seeking to repudiate and asking the court to review the

Government's own action in the issuance of the patent. In United States v. Bradford, the attack in the Federal court, in a criminal prosecution, was upon the validity of the appointment of an administrator by a state court. But the question in that case would parallel the one involved under the instant motion to strike only if the United States itself had appointed the administrator. That case is further distinguishable because the appointment of the administrator was, according to the averments in the indictment, obtained by fraud and because the court appointing the administrator, under the facts averred in the indictment, lacked power to make the appointment so that the same was void. Thus these three cases leave unanswered the question before this court under the motion to strike paragraph 46(a) of the Government's complaint.

■ The Government asserts, third, that patents for invention are only prima facie valid and the courts have always permitted a party "in a proper case" to show their actual invalidity in the respects mentioned in paragraph 46(a) of the complaint. This is of course well established for private infringement cases. One accused of infringement may defend upon the ground that the accuser's patent is invalid for lack of invention. Reckendorfer v. Faber, 1875, 92 U.S. 347, 23 L.Ed. 719; Dunbar v. Myers, 1876, 94 U.S. 187, 24 L.Ed. 34. In Reckendorfer v. Faber, where the plaintiff accuser contended that the Commissioner's decision was conclusive upon the point of invention and that that question was not open to the judgment of the court, the Court rejected the contention. The Government relies on the following statement of the Court:

"Before the commissioner is authorized to issue a patent, it must appear to him that the claimant is justly entitled to a patent; i.e., that his art, machine, or manufacture, possesses all the qualities before mentioned. The commissioner must also be satisfied, that, if it possesses these qualities, it is sufficiently useful and sufficiently important to justify him in investing it with the prima facie respect arising from the governmental approval. * * *

"It is nowhere declared in the statute that the decision of the commissioner, as to the extent of the utility or importance of the improvement, shall be conclusive upon that point * * *." (92 U.S. at page 351, 23 L.Ed. 719).

In Dunbar v. Myers, again an infringement suit between private parties, the question of the validity of the patent was raised by the defendant. The Supreme Court, reversing a ruling of the trial court that on the facts the plaintiff's patent was valid, said:

"Persons seeking redress for the unlawful use of letters-patent must allege and prove that they, or those under whom they claim, are the original and first inventors of the alleged improvement, and that the letters-patent have been infringed by the party against whom the suit is brought. *Prima facie* support to the first requirement is derived from the patent, if it is introduced in evidence and is in due form, provided the alleged improvement is one which in its nature is patentable. Evidence to overcome that presumption, however, is always admissible, if due notice is given by the opposite party, as required by law; and the question is now well settled, that the question whether the alleged improvement is or is not patentable, is, in an equity suit, a question for the court." (94 U.S. at page 196, 24 L.Ed. 34).

In Slawson v. Grand Street R. R. Co., 1882, 107 U.S. 649, 2 S.Ct. 663, 27 L.Ed. 576, the Court took the position that lack of invention could be urged in an infringement suit even though not specifically pleaded.

But the defendants in the instant case are not accused of infringement and the Government is not so accused. The assertion of the Government and the cases cited still leave open the question whether or not the instant case is "a proper case" for determination by the court of invalidity of the patents upon which the defendants' license agreements rest. That is to say, neither the proposition stated by the Government nor the cases cited answer the question whether the Government which issued the patents can, even in an anti-trust suit, attack and the court review the validity of the Government's own action in issuing them. No such question was presented in the cases cited, for in those cases the attack upon the validity of the patents was made by a private party.

■■ The Government contends, fourth, that, assuming that in an ordinary anti-trust proceeding the Government would be estopped to question the validity of the defendants' patents, nevertheless, on the facts of the instant case, the defendants are themselves estopped to insist upon the point.

It has been suggested above that the question presented under the motion to strike paragraph 46 (a) cannot be answered in terms of mere estoppel—that the question is more fundamental. However, the contention of the Government in this aspect of the case will be discussed in the Government's own terms. The argument of "estoppel against estoppel" divides itself into two propositions. In one the Government asserts that the Patent Office is overburdened and is also not in a position to make a searching examination and final determination of all considerations bearing upon the right of an applicant to obtain a patent, such considerations as inventions, utility, commercial success, novelty, anticipation and the like, and that it accordingly relies heavily upon the oath and affidavits of the applicant in issuing a patent. And the Government declares that at the time the application was made to the Commissioner for issuance of the Roos "Foam" patent, No. 2,017,022, counsel for the applicant submitted an affidavit stating that more than 3 billion square feet of wallboard embodying the Roos invention had been manufactured and sold during the preceding ten year period and that seven manufacturers, to wit, the present defendants or their predecessors, had taken licenses and were producing the board in large quantities. Evidence of commercial success, the Government points out, may properly be considered by the Commissioner in determining whether or not an alleged invention is patentable. But, contends the Government, the Commissioner had no practical means of checking the Roos figures or affidavit but evidently assumed them to be true; and no mention was made to the Commissioner, the Government avers, that the United States Gypsum Company and its licensees comprised all of the manufacturers east of the Rocky Mountains, that the license agreements under which the licensees operate provide for price fixing and had the effect, alleged by the Government in the instant case, of driving unpatented board from the market. Such matters, so it is urged, if known to the Commissioner might obviously have had a bearing upon his determination. Spelling out its argument somewhat further, the Government asserts that the primary purpose of the industry in adopting the Roos patents may not have been so much to take advantage of their novelty or utility as that they afforded a ready means of bringing erstwhile competitors together in a combination in restraint of trade; that therefore some of the data furnished the Commissioner as a basis for the issuance of the Roos patent No. 2,017,022 may have been the result of the present combination. Hence, the Government contends, "It would be a strange perversion of law if the defendants could combine to provide the evidence of novelty and utility upon which a patent is issued and then be allowed to estop the Government from showing the true facts in an antitrust proceeding, since it had issued the patent[s] in reliance on that evidence."

But we think that the Government is itself "estopped" to make this contention in this case. The contention is in effect a charge that the Roos patent referred to was obtained by fraudulent misrepresentation on the part of the applicant. It is hence in conflict with the concession of the Government that there is no issue of fraud in this case in respect of the obtaining of the patents which it seeks to attack under paragraph 46(a). At no point in the complaint, even in paragraph 46(a), does the Government charge that the patents were obtained by fraud. And it is expressly stated at another point in the Government's brief presented under the instant motion to strike that fraud is a matter not in issue in the case. Commonwealth v. Bierly, 1908, 37 Pa.Super.Ct. 496, cited by the Government in this aspect of the case, was a case in which a patent had been issued by the Commonwealth of Pennsylvania for land on an application for a warrant (to be followed by a patent) alleging a vacancy when in fact no vacancy existed. Subsequently the Commonwealth took title to the same land for forestry purposes by mesne conveyances from the holder of an older title. It was held that one claiming under the junior patent could not allege that as the junior patent was issued by the Commonwealth for a valuable consideration the Commonwealth was estopped from afterwards acquiring by purchase the older title and setting it up to defeat its own later grant. Two considerations distinguish the case from the instant case. One is that the land laws of the Commonwealth neither required nor authorized, upon the filing of an application for a warrant, an independent investigation by the land office to ascertain the truth of the basic fact asserted in it. The warrant issued as of course, and the responsibility for the result that, if the land had been previously appropriated no title

passed, was left to rest with the applicant who had voluntarily assumed it. The other consideration is that the rule of estoppel of a grantor to dispute the title of his grantee, as by setting up a prior paramount title in himself or in a third person, applies only to solemn deeds with covenants of seizin and warranty or for quiet enjoyment, and not to mere quitclaims containing none of the covenants referred to. A patent to an invention is not issued without investigation but on the contrary after consideration by expert patent examiners in the office of the Commissioner; and the grant of a patent to an invention is more than a mere quitclaim. There is set forth in the margin, supra, a copy of Roos patent No. 2,017,022 which is in the usual form in which the United States issues letters patent. The same indicates on its face due examination and a solemn grant.

■ The second proposition of the Government under its fourth contention of law is this: It is provided in each of the license agreements involved in the instant case that the licensees, who with the United States Gypsum Company comprise all of the manufacturers east of the Rocky Mountains, will not contest the validity of the United States Gypsum Company's patents; and in certain agreements of October, 1929, the licensees in acknowledging the validity of patents already issued purport also to acknowledge the validity of any letters patent which may be granted or issued upon pending applications. In effect, therefore, the Government urges, the United States Gypsum Company has not only asked the Government through the Commissioner to issue the patents in suit upon its representations of fact but also it has combined with the licensee defendants to stop any normal test of their validity. Ordinarily, the Government asserts, the check upon the determinations of the Commissioner is the infringement suit; an invalid patent will either not be used at all by the inventor or if used will be quickly challenged by others interested in the art, since Rev.Stat. § 4920 (1875), 35 U.S.C.A. § 69, fully recognizes the rights of an alleged infringer to contest the validity of a patent. But in the circumstances of the instant case, says the Government, no one outside the group of licensee defendants is likely to hazard the expense necessary to make an effective challenge against "a powerful combination carefully fenced in behind, not one, but many patents in the art." This is in effect an argument by the Government that the defendants are not in court with clean hands. It was so put in the oral argument on this motion. The defendants therefore, it is urged, have estopped themselves to insist that the Government may not attack the validity of the patents, and the matter is now at large. But there is nothing inherently unclean about an agreement by a licensee not to contest the validity of his licensor's patent. Indeed there may be circumstances in which such an agreement is natural and wholesome, as, for example, where after expensive delaying litigation between patentees and alleged infringers it is desired by such parties to settle their controversies by an agreement which will avoid future litigation. Such agreements not to contest the validity of patents are moreover not illegal, and the Government does not make an outright contention that they are. It suggests that they may be, or ought to be, treated as void as against public policy. But the only authority cited for this is Pope Manufacturing Co. v. Gormully, 1892, 144 U.S. 224, 12 S.Ct. 632, 36 L.Ed. 414. In that case the defendant had been granted a license to manufacture and sell stated patented devices under patents owned by the plaintiff and had agreed not to import, manufacture or sell devices covered by certain other patents, and had also agreed that he would not contest the validity of the plaintiff's patents or his title thereto. There was a further provision that if after termination of the license agreement the defendant manufactured, sold or used any devices covered by the patents involved in the agreement, the plaintiff might treat him as breaching the contract or as an infringer and might have an injunction issued by any court without notice. The action was for an accounting and injunction, it being asserted that the defendant had imported, manufactured or sold devices covered by "the other patents." But it was found that the defendant, due to the plaintiff's artifice, had signed the license agreement without comprehending its import so far as concerned the "unusual or oppressive" stipulations of that portion which forbade the defendant to contest the validity of or title to the plaintiff's patents, bound him to agree not to import, manufacture or sell devices covered by other patents, and subjected him to an injunction without notice. The Court held that, because of the

oppressive character of the contract and the apparent artifice used by the plaintiff in securing the defendant's consent to it, the plaintiff was not in court with clean hands and could therefore not seek equitable relief. But the Court expressly declined to pass upon the question whether the contract was invalid as against public policy, i.e., it refused to answer the question whether the defendant could estop himself from disputing patents which might be void or to which the plaintiff might have no title. It is to be noted further that if, as the Government suggests, an agreement by a licensee not to contest the validity of the licensor's patent is void as against public policy, then the defendant licensees in the instant case are free to contest the validity of the patents, and therefore the premise of the Government's argument, that the Government ought not be forbidden to contest the validity of the patents for the reason that the normal test by individuals in infringement suits has been foreclosed, falls. It is to be noted also that the contention of the Government that the licensee defendants have bound themselves not to contest the validity of the patents and that no other persons are likely to do so and that therefore the Government ought to be permitted itself to raise the question of validity, is an argument of what the law ought to be with respect to the right of the Government to repudiate the action of its own Commissioner of Patents and the power of the courts to review the action of the Commissioner except where induced by fraud; it is not an argument as to what the law is. On that subject further comment is made below.

## IV.

The answer to the question presented by the motion to strike or for partial judgment dismissing paragraph 46(a) lies not in the contentions made, and authorities cited, by the Government, but in considerations of a more fundamental nature:

 1. The United States is an entity of conferred, not inherent, powers. Its authority is found in the objective law set up by the people in the Constitution, in statutes, in judicially recognized principles. What is true of the United States in this respect is true of its governmental departments and agencies. The Constitution, Art. I, § 8, Clause 8, gives Congress power "To promote the Progress of Science and useful Arts, by securing, for limited Times to Authors and Inventors, the exclusive Right to their respective Writings and Discoveries." The statute authorizing the issuance of patents provides that:

"Any person who has invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvements thereof * * * not known or used by others in this country, before his invention or discovery thereof, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, or more than one year prior to his application, and not in public use or on sale in this country for more than one year prior to his application, unless the same is proved to have been abandoned, may, upon payment of the fees required by law, and other due proceeding had, obtain a patent therefor." (Rev.Stat. § 4886 (1875), amended 29 Stat. 692 (1897), 46 Stat. 376 (1930), 53 Stat. 1212 (1939), 35 U.S.C.A. § 31).

The United States acts in its sovereign capacity in issuing patents under these constitutional and statutory provisions. There is nothing in them or in the Sherman Act or in judicially recognized principles that permits it to repudiate patents or to ask the courts to do so after their issuance, except for fraud in the obtaining of the patents. The right to cancel for fraud is mentioned below.

 2. The attack upon the validity of the patents under paragraph 46(a) involves a breach, as between the Government and the patentees and those dealing with the patentees, of the Government's grant. In issuing the patents through the Commissioner the Government "upon due examination * * * adjudged [the claimants] to be justly entitled to a patent under the Law" and thereupon made a solemn grant. When an alleged infringer attacks the validity of a patent under Rev.Stat. § 4920 (1875), 35 U.S.C.A. § 69, he is breaking no grant of his own since he did not issue the patent. No private litigant could expect relief in a court of equity upon the premise of a broken promise on his own part. A fortiori the Government should not. On the contrary it should scrupulously keep and perform each of its own covenants. One of the first objectives and essentials of good government is order and certainty in relations between govern-

ment and citizen. This cannot be secured if the Government itself is not to be depended upon to abide its grants, even if they have been improvidently or erroneously made. The attack of the Government upon the patents under paragraph 46(a) is based upon the extraordinary premise that the Government can in one department issue a grant and in another question its own action, in the absence of charges of fraud in inducing the action. Common principles of justice and fairness in dealings between patent applicants and the Government give patentees a right to assume that their patents are valid insofar as any attack on them by the Government which issued them is concerned, unless the attack is for fraud in the obtaining of the patents.

In ruling that the Government cannot attack, nor the court review, in this proceeding the validity of the patents, the court does not assume to justify any misuse of the patents as a cloak for illegal restraints of trade or price fixing beyond the proper limits of a patent monopoly. If such conduct be shown, as charged, it is amenable to law. But that is a different aspect of this case; and two wrongs do not make a right. That the defendants may be shown to have misused the patents is no warrant for the Government's repudiating its own assurance that they were issued upon due examination and according to law and conferred an exclusive right for a given period of years. As pointed out above, in the present aspect of the Government's case, i.e., that arising under paragraph 46(a), the patents are not attacked as invalid because illegally used; on the contrary illegal use is predicated upon their invalidity, and this is not charged in the complaint as due to any fraud or overreaching, but only to erroneous action of the Commissioner in issuing the patents.

█ 3. It is settled law that although the Federal courts may compel an officer or agency in the executive branch of the Government to perform a ministerial duty or to refrain from threatened action clearly beyond legal authority and may, under the due process clause of the Constitution, examine upon a bill in equity into governmental action alleged to have been taken wholly without jurisdiction, or to have been arbitrary or induced by fraud, the courts do not have authority in the absence of statute to review the exercise of discretion or judgment by officers or agencies of the executive branch of the Government. Welch v. Obispo Oil Co., 1937, 301 U.S. 190, 57 S.Ct. 684, 81 L.Ed. 1033; Leach v. Carlile, 1922, 258 U.S. 138, 42 S.Ct. 227, 66 L.Ed. 511; Houston v. St. Louis Independent Packing Co., 1919, 249 U.S. 479, 39 S.Ct. 332, 63 L.Ed. 717; see American T. & T. Co. v. United States, 1936, 299 U.S. 232, 236,[6] 57 S.Ct. 170, 81 L.Ed. 142. This is the theory which underlies the decision of United States v. American Bell Telephone Company, 1897, 167 U.S. 224, 17 S.Ct. 809, 820, 42 L.Ed. 144, certain language of which has been quoted above as relied upon by the Government in support of its contentions herein. That was a suit by the United States to cancel a patent to a telephone transmitter upon two separate grounds, one that the patent had been obtained by fraud, the other that the patentee was not the original and first inventor. It was held that the Government must fail as to the first ground because fraud had not been established, and that as to the second it must fail also, for the reason that "The judgment of the Patent Office, the tribunal established by Congress to determine such questions, was adverse to the contention of the Government, and such judgment cannot be reviewed in this suit." (167 U.S. at page 264, 17 S.Ct. at page 820, 42 L.Ed. 144). In the course of the opinion the Court discussed two previous cases, United States v. American Bell Telephone Co., 1888, 128 U.S. 315, 9 S.Ct. 90, 32 L.Ed. 450, and United States v. American Bell Telephone Co., 1895, 159 U.S. 548, 16 S.Ct. 69, 40 L.Ed. 255, saying there was nothing in either of them to conflict with the views expressed in the opinion. In concluding its opinion the Court said:

"In United States v. Telephone Co., supra, [the reference is to the first of the two cases just mentioned] it was decided that where a patent for a grant of any kind issued by the United States has been obtained by fraud, by mistake or by accident, a suit by the United States against the patentee is the proper remedy for relief and that in this country, where there is no kingly prerogative, but where patents for land and inventions are is-

---

[6] For a description of matters appropriate for judicial review see Federal Radio Commission v. Nelson Brothers Bond & Mortgage Co., 1933, 289 U.S. 266, 274–278, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406.

sued by the authority of the Government, and by officers appointed for that purpose, who may have been imposed upon by fraud or deceit, or may have erred as to their power, or made mistakes in the instrument itself, the appropriate remedy is by proceedings by the United States against the patentee.

"But while there was thus rightfully affirmed the power of the Government to proceed by suit in equity against one who had wrongfully obtained a patent for land or for an invention, there was no attempt to define the character of the fraud, or deceit or mistake, or the extent of the error as to power which must be established before a decree could be entered canceling the patent. It was not affirmed that proof of any fraud, or deceit, or the existence of any error on the part of the officers as to the extent of their power, or that any mistake in the instrument was sufficient to justify a decree of cancellation. *Least of all was it intended to be affirmed that the courts of the United States, sitting as courts of equity, could entertain jurisdiction of a suit by the United States to set aside a patent for an invention on the mere ground of error of judgment on the part of the patent officials. That would be an attempt on the part of the courts in collateral attack to exercise an appellate jurisdiction over the decisions of the Patent Office, although no appellate jurisdiction has been by the statutes conferred. We are of opinion, therefore, that the question, as stated, is not open for consideration in this case.* * * *"* (167 U.S. at pages 269, 270, 17 S.Ct. at pages 821, 822, 42 L.Ed. 144). (Italics supplied)

The Court said also in the course of the opinion:

" * * * the Government is as much bound by the laws of Congress as an individual, and when Congress has created a tribunal to which it has given exclusive determination in the first instance of certain questions of fact and has specifically provided under what circumstances that determination may be reviewed by the courts, the argument is a forcible one that such determination should be held conclusive upon the Government, subject to the same limitations as apply in suits between individuals." (167 U.S. at page 268, 17 S.Ct. at page 821, 42 L.Ed. 144).

The decision of course does not constitute a direct ruling that the Government cannot seek in an antitrust proceeding, incidental to determination of the primary question of violation of the Sherman Act, a judicial determination of the invalidity of patents relied upon by the defendants as a basis of license agreements themselves urged in defense of the charge of Sherman Act violation. But the case does reflect the general principle that the Federal courts sitting in equity do not have power in the absence of statute to set aside at the instance of the Government a determination made by a tribunal or officer in the executive branch of the Government except when such determination has been induced by fraud. And the reasoning of the Court in the case is as apt for incidental attack upon the validity of patents as for direct attack.

There are similar rulings by the United States Supreme Court in respect of determinations of the Land Office. In United States v. Coronado Beach Co., 1921, 255 U.S. 472, 41 S.Ct. 378, 65 L.Ed. 736, the Government sought by a bill in equity to ascertain the rights of private parties in an island in the harbor of San Diego, California, and to condemn the island for public purposes. The Government contended that private ownership went only to the shore line, the Beach Company that it included tide lands. The title of the Beach Company was derived from a Mexican grant of 1846 to one Carrillo, a Mexican citizen, to whose rights the Beach Company had succeeded. Intermediate holders of the title had in 1852 petitioned Commissioners to settle Private Land Claims appointed under an Act of March 3, 1851, 9 Stat. 631, to confirm to them the land in question, and although this petition was rejected by the Commissioners, on appeal to the United States District Court the title was declared good and confirmed, the decree stating the boundaries on the north, east and south as in the original grant, and "west by the anchorage for ships, according to the documents of title and map to which reference is had." In 1869 a patent was issued reciting this decree, a return with a plat of a survey approved under the Act of 1851, and giving and granting the land described in the survey. The Government attempted to show that the extent of the land patent as thus confirmed was erroneous. The Court held that this was not allowable. Speaking for the Court Mr. Justice Holmes said:

"* * * The grant to Carrillo was bounded 'west by the anchorage for ships' and although it well may be that in view of the purpose set out in his petition and the circumstances the grant could have been construed more narrowly, that was a matter to be passed upon and when the decree and the patent went in favor of the grantee it is too late to argue that they are not conclusive against the United States. It is said that the field notes, not put in evidence at the trial, show that the deep water line was not surveyed, but was taken from the Coast Survey maps. But however arrived at it was adopted by the United States for its grant and it cannot now be collaterally impeached. * * *" (255 U.S. at page 488, 41 S.Ct. at page 379, 65 L.Ed. 736).

The Government's attack in United States v. Coronado Beach Co. upon the land patent for error in issuing it was direct. A fortiori an indirect or collateral attack is not allowable. In Burke v. Southern Pacific R. R. Co., 1914, 234 U.S. 669, 34 S.Ct. 907, 58 L.Ed. 1527, there was a bill in equity to establish a right to lands. The plaintiff claimed under a clearly junior title but asserted that the grant to the defendant Railroad Company was invalid because the lands contained minerals. Mineral land was excepted by statute from grants. The District Court dismissed the bill and upon certification by the Circuit Court of Appeals of questions to the Supreme Court that Court said:

"The exclusion of mineral lands is not confined to railroad land grants, but appears in the homestead, desert-land, timber and stone, and other public-land laws, and the settled course of decision in respect of all them has been that the character of the land is a question for the Land Department, the same as are the qualifications of the applicant and his performance of the acts upon which the right to receive the title depends, and that when a patent issues it is to be taken, upon a collateral attack, as affording conclusive evidence of the non-mineral character of the land and of the regularity of the acts and proceedings resulting in its issue, and, upon a direct attack, as affording such presumptive evidence thereof as to require plain and convincing proof to overcome it. Smelting Co. v. Kemp, 104 U.S. 636, 641 [26 L.Ed. 875]; Steel v. Smelting Co., 106 U.S. 447 [1 S.Ct. 389, 27 L.Ed. 226]; Land Grant Case [United States v. Maxwell Land-Grant Co.], 121 U.S. 325, 379–381 [7 S.Ct. 1015, 30 L.Ed. 949]; Heath v. Wallace, 138 U.S. 573, 585 [11 S.Ct. 380, 34 L.Ed. 1063]; Noble v. Union River Logging Railroad, 147 U.S. 165, 174 [13 S.Ct. 271, 37 L.Ed. 123]; Burfenning v. Chicago, &c. Railway Co., 163 U.S. 321, 323 [16 S.Ct. 1018, 41 L.Ed. 175]. In this respect no distinction is recognized between patents issued under railroad land grants and those issued under other laws; nor is there any reason for such a distinction.

"Of course, if the land officers are induced by false proofs to issue a patent for mineral lands under a non-mineral-land law, or if they issue such a patent fraudulently or through a mere inadvertence, a bill in equity, on the part of the government, will lie to annul the patent and regain the title, or a mineral claimant who then had acquired such rights in the land as to entitle him to protection may maintain a bill to have the patentee declared a trustee for him; but such a patent is merely voidable, not void, and cannot be successfully attacked by strangers who had no interest in the land at the time the patent was issued, and were not prejudiced by it. [Citing cases]" (234 U.S. at pages 691, 692, 34 S.Ct. at page 916, 58 L.Ed. 1527).

4. The Government's contentions in respect of the right to attack the validity of the patents under paragraph 46(a) of the complaint really amount to an assertion not that it is, but that it ought to be, the law that notwithstanding the grant of a patent by the Commissioner of Patents the Government may test the validity of the patent in the courts. The Commissioner and his staff are asserted to be incapable, because of press of business and the conditions under which the Patent Office operates, including unavoidable ignorance of anticipation, of reaching conclusively dependable determinations in respect of the right to a patent; hence recourse to the courts to correct the Commissioner's action should be allowed, so it is urged. It is to be noted that this argument is as valid for direct attack as for incidental. If the assertions of the Government in respect of the limitations of the Patent Office are correct—upon this the court does not assume to pass—and if such limitations cannot otherwise be corrected, a case may perhaps be made for the devising of some test outside the Patent Office of the validity of patents. But it does not follow that it is within the proper

function of the courts to devise it. There is of course a recognized place for growth of the law through judicial decision in the "interstitial" or borderline case, but radical departures or innovations are not properly made by courts. Judges are not appointed in representative capacity for the purpose of law making; and judicial innovations upon the law are especially to be avoided when they would upset transactions entered into on the faith of the law as it is. Conceivably there should be Congressional action creating a statutory right in the Government to test in the courts the correctness of determinations of the Commissioner of Patents, some such remedy perhaps as is now afforded patent applicants under Rev.Stat. § 4915 (1875), 35 U.S.C.A. § 63. But such a remedy if created by statute would undoubtedly be made prospective in effect, that is to say, would apply only to patents issued after the passage of the act. Moreover, the actions permitted under such a statute would properly be made subject to a limitation in time, so that after a given period the rights under a patent would be secure to the patentee and those dealing with him so far as interference by the Government was concerned. It is not within the proper function of courts to open the door by judicial innovation to Government attack on patents, retroactive in effect and without limitation in time, and thus to unsettle industrial security so far as it is based on the patent system.

## V.

■■■■ There is authority to the effect that motions under Rule 12(f) are not an appropriate means of testing the legal sufficiency of a pleading. Hartford-Empire Co. v. Glenshaw Glass Co., D.C. W. D. Pa. 1942, 47 F.Supp. 711, 6 Fed.Rules Serv. 12b. 51; Dysart v. Remington Rand, D.C.D.Conn. 1939, 31 F.Supp. 296, 2 Fed. Rules Serv. 12b. 51. Therefore the motion now before the court is ruled on in terms of the alternative motion for a partial judgment, and the court will order a dismissal of that portion of the Government's complaint contained in paragraph 46(a) except the first and last sentences of that paragraph. It is true that, as suggested by the defendants, the last sentence is in somewhat conclusional terms, but the court thinks not objectionably so under the broad allowances of the Federal Rules of Civil Procedure with respect to pleadings.

In deciding as the court does that the Government cannot properly attack the validity of patents as it seeks to do under paragraph 46(a) of the complaint, it is not ruled that all evidence on the topics mentioned in those portions of paragraph 46(a) other than the first and last sentences is necessarily inadmissible on some issue in the case other than that of the validity of the patents. It occurs from time to time in the trial of cases that evidence inadmissible in respect of one issue is admissible in respect of another. So far as the right of the Government to attack the validity of the patents is concerned the court rules definitely that it has no such right, and the court no authority to pass on the same; that the patentees and those dealing with them had and have a right to assume the validity of the patents so far as any attack by the Government on its own grant is concerned. But in respect of other issues the relevancy, materiality and competency of evidence offered, whether or not it touches the topics mentioned in paragraph 46(a), will be passed upon at the time of the offer.

I am authorized to state that Judge GARRETT concurs in the foregoing opinion and decision.

BLAND, Judge (dissenting).

In my view, it makes little difference whether or not paragraph 46(a) of the complaint is stricken, but the implication drawn from the striking of it requires that I briefly express my views in dissenting.

The Sherman Anti-Trust Law forbids illegal combinations or monopolies which restrain interstate trade. It is well-settled that an inventor or his assignee has the right to a monopoly in the manufacture and sale of his patented article. United States v. General Electric Co. et al., 1926, 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362. However, such a monopoly has been declared to be a "limited monopoly." Oxford Varnish Corporation et al. v. Ault & Wiborg Corporation, 6 Cir., 1936, 83 F.2d 764; see also Bement v. National Harrow Co., 1902, 186 U.S. 70, 91, 22 S.Ct. 747, 46 L.Ed. 1058. Thus it is seen that when Congress passed the Sherman Act, we had two conflicting laws on the subject of monopoly. It is the duty of the courts, if possible, to harmonize the two statutes in such a way as to give force and effect to both and arrive at the true intent of Congress in the enactment of the anti-trust law.

As I understand it, the chief reliance of the defendants in support of their contention that the Government in this case has no right, through its Department of Justice, to attack the validity of a patent, is upon United States v. American Bell Telephone Company, 1897, 167 U.S. 224, 17 S.Ct. 809, 820, 42 L.Ed. 144. The holding in that case, as pertinent to the inquiry here, is in the following language:

"Suits may be maintained by the Government in its own courts to set aside one of its patents not only when it has a proprietary and pecuniary interest in the assault, but also when it is necessary in order to enable it *to discharge its obligations to the public,* and sometimes when the purpose and effect are simply to enforce the rights of an individual. *In the former cases it has all the privileges and rights of a sovereign. The statutes of limitation do not run against it. The laches of its own officials does not debar its right.* Van Brocklin v. Tennessee, 117 U.S. 151 [6 S.Ct. 670, 29 L.Ed. 845]; United States v. Nashville, Chattanooga &c. Railway, 118 U.S. 120 [6 S.Ct. 1006, 30 L.Ed. 81]; United States v. Insley, 130 U.S. 263 [9 S.Ct. 485, 32 L.Ed. 968]. But when it has no proprietary or pecuniary result in the setting aside of the patent; is not seeking to discharge its obligations to the public; when it has brought the suit simply to help an individual; *making itself, as it were, the instrument by which the right of that individual against the patentee can be established, then it becomes subject to the rules governing like suits between private litigants.* * * *" [Italics mine.]

This case is not authority for a holding that the Government in the instant action, when acting for the public through the Department of Justice, being duly empowered by Congress to enforce the anti-trust laws as against what it alleges is a combination built around certain invalid patents, is estopped from challenging the validity of said patents. On the contrary, the mandate of the Sherman Act is that, under the direction of the Attorney General by appropriate officers, proceedings *shall* be instituted to remedy the wrongs brought about by a violation of the Sherman Act. The statute calls into action and authorizes proceedings in which it may be determined whether the Sherman Act is being violated or "valid patent rights" are being exercised.

The exact question presented here has never been directly presented before as far as I know; and since I am convinced that there must be some new declaration of law made by our highest court as to where the line of demarcation rests between the exercise of valid patent rights and acts that are in violation of the anti-trust laws, I feel that such cases as Sola Electric Co. v. Jefferson Electric Co., 1942, 317 U.S. 173, 63 S.Ct. 172, 174, should be given more consideration than has been accorded them by the majority. In that case (a royalty suit) the defendant-licensee was, under the decisions, when the case came to the Supreme Court, barred from pleading the invalidity of the patent, but it pleaded that the agreement was in violation of the anti-trust laws and that therefore it had a right to say that the agreement was unlawful if the patent was invalid. The Supreme Court upheld this contention and stated:

"Local rules of estoppel which would fasten upon the public as well as the petitioner the burden of an agreement in violation of the Sherman Act must yield to the Act's declaration that such agreements are unlawful, and to the public policy of the Act which in the public interest precludes the enforcement of such unlawful agreements. * * *"

It also stated:

"* * * We granted certiorari * * * the question being of importance to the administration of the patent laws and the Sherman Anti-Trust Act."

As a basis for my conclusion, I rely also upon the following authorities: Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; United States v. Univis Lens Co., Inc., et al., 1942, 316 U.S. 241, 62 S.Ct. 1088, 86 L.Ed. 1408; United States v. Masonite Corporation et al., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; and Becher v. Contoure Laboratories, Inc., et al., 1929, 279 U.S. 388, 49 S.Ct. 356, 357, 73 L.Ed. 752. In the last-cited case the following is found:

"* * * Again, even if the logical conclusion from the establishing of Oppenheimer's claim is that Becher's patent is void, that is not the effect of the judgment. Establishing a fact and giving a specific effect to it by judgment are quite distinct. A judgment *in rem* binds all the world, but the facts on which it necessarily proceeds are not established against all the world, Manson v. Williams, 213 U.S. 453,

455 [29 S.Ct. 519, 53 L.Ed. 869], and conversely establishing the facts is not equivalent to a judgment *in rem*.

"That decrees validating or invalidating patents belong to the Courts of the United States does not give sacrosanctity to the facts that may be conclusive upon the question in issue. A fact is not prevented from being proved in any case in which it is material, by the suggestion that if it is true an important patent is void—and, although there is language here and there that seems to suggest it, we can see no ground for giving less effect to proof of such a fact than to any other. * * *"

The last-cited authority is important in view of my conclusion that the *fact* of invalidity is pertinent to the issue here involved aside from the the the question of the declaration of a patent's invalidity. The invalidity of defendants' patents, if any of them are invalid, is of concern here only in so far as it goes to the determination of the right of defendants to rely upon a patent monopoly for acts which would otherwise, admittedly, be contrary to the Sherman Act.

When the Department of Justice attempts to take action against a monopoly, it frequently occurs that the defendants contend that they have a right to have a monopoly and to restrain trade because their conduct is nothing more than the exercise of their rights under the patent laws. So, defendants file an answer, as they did in the instant case, showing that they rely upon the ownership of "valid patents" as an excuse for their contracts of price-fixing and trade-restraining. When such a defense is interposed, it is my view that, whether or not the Government has pleaded that the patents are invalid and regardless of the fact that they are to be regarded as prima facie valid, the Government has the right to show, if it can, that the patents relied upon are either invalid (concerning which the defendants would probably have more knowledge than anyone else) or are of such character in their relation to the prior art as to be no justification for violating the Sherman Act.

It seems to me that any other conclusion is anomolous. Can a defendant say, "Yes, I would be violating the Sherman Act if I were not acting under my valid patent rights," and then close the mouth of the Government to show that the patents are such as to be no justification for such a

violation? In attacking the validity of the patents, as the Government seeks to do in the instant case, it is not attempting to establish invalidity for the purpose of cancellation or for the purpose of protecting any other inventor or anyone who wishes to manufacture defendants' products. It is attempting to show, in "discharge of its obligations to the public" under statutory mandate, the nature of the patents for the purpose of showing that they are no justification for the alleged monopoly and restraint of trade, whether valid or invalid.

In this view, it seems to me that the decisions relied upon by the majority are no authority for holding that the Government, under such circumstances, has no right to question the validity of the patents for the purposes stated. The result of the ascertainment of invalidity in the instant case is not the result sought in any decided case relied upon by the majority. It is the *fact* of invalidity which goes to the question as to whether or not the defendants in the instant case are using the patents as a smoke-screen (and I am not implying that they are) in order to carry on what the Government charges is a violation of the law.

If the striking of paragraph 46(a), which alleges that the patents relied upon are invalid, implies that the court does not have the right to accept evidence as to the nature of the patents relied upon, even though it shows them to be invalid, I think the striking would be erroneous. If the paragraph is stricken because it is unnecessary, or if the evidence of invalidity could be accepted for other purposes, then it is of little consequence what happens to paragraph 46(a).

I need not here discuss the broader aspect of the question as to whether or not the General Electric case (which, unlike the instant case, involved the conduct of principal and agent) should be modified where competitors and not bona fide agents are concerned, in the light of the present trend of decisions, and as to whether a valid patent monopoly should be held not to be one which encompasses the scope contained in the allegations of the Government. I have matured no view on this phase of the case.

For reasons hereinbefore stated, I feel compelled to dissent from the conclusion reached by the majority on the motion to strike and for partial judgment.